K. MICHAEL MOORE, CHIEF UNITED STATES DISTRICT JUDGE
*1296 This cause came before the Court upon Performance Orthopaedics & Neurosurgery, LLC d/b/a Calhoun Orthopaedics & Neurosurgery ("Calhoun"), Physicians Central Business Office, LLC ("CBO"), Mark Cereceda, D.C. ("Dr. Cereceda"), and Brian Mevorah, D.C.'s ("Dr. Mevorah") ("Defendants") Motion for Summary Judgment ("Defs.' Mot.") (ECF No. 216)[1] and Plaintiff State Farm Mutual Automobile Insurance Company's ("State Farm") Amended Motion for Partial Summary Judgment ("Pl.'s Mot.") (ECF No. 254). The Parties filed their respective Responses and Replies. ("Pl.'s Resp.") (ECF No. 235); ("Defs.' Reply Mot.") (ECF No. 246); ("Defs.' Resp.") (ECF No. 237); (Pl.'s Reply") (ECF No. 244). The Motions are ripe for review.[2]
I. BACKGROUND[3]
In 2011 Calhoun was formed by Dr. Cereceda, Dr. Mevorah, and non-parties Dr. Triana and Dr. Lewin. Bilateral Pretrial Stipulation ("Stipulation") (ECF No. 266) at 13; Pl.'s 56.1, ¶ 2. During the relevant time period, each owner was a licensed health care practitioner. Stipulation at 13.[4] Calhoun provided various health care services to individuals who suffered injuries in automobile accidents based on letters of protection ("LOPs"). Id. LOPs allowed patients to defer payment of medical bills until they favorably settled or prevailed in their bodily injury ("BI") claims. Defs.' 56.1, ¶ 2. On occasion, Calhoun submitted bills for treatment to patients' personal injury protection ("PIP") insurers. Pl.'s 56.1, ¶ 9; Defs.' Reply 56.1, ¶ 60. ("Calhoun generally did not submit bills for any treatment to the patients' personal injury protection insurer for payment."). Dr. Mevorah was designated the managing member to run Calhoun. Deposition *1297 of Dr. Mevorah ("Mevorah Dep.") (ECF No. 214-10) at 75:12-14; Mevorah Interrogatory ("Mevorah Interrog.") (ECF No. 214-2) at 5.
CBO was formed in 2011 and provided billing and collection services for Calhoun. Stipulation at 13. Dr. Cereceda is the sole owner of CBO. Id.
Metropolitan was a community acute care hospital that opened in February 2007 and closed in April 2014. Id. In 2011, Calhoun and Metropolitan representatives met to discuss the use of Metropolitan's facility by Calhoun physicians to perform surgeries on Calhoun patients (hereinafter the Calhoun and Metropolitan Arrangement or the Arrangement). Id. at 14. Calhoun physicians obtained privileges at Metropolitan and Metropolitan provided Calhoun physicians with an operating room and all attendant services necessary to perform surgeries. Id. Metropolitan then issued a notice of sale and assignment of the Metropolitan bill to Calhoun. Pl.'s 56.1, ¶ 26; Defs.' Resp. 56.1, ¶ 26; Pl.'s Reply 56.1, ¶ 26. The amount Calhoun paid for the bill was generally arranged before surgery but some charges could not be determined until after the surgery was performed. Pl.'s 56.1, ¶¶ 26, 34; Defs.' Resp. 56.1, ¶¶ 26, 34; Pl.'s Reply 56.1, ¶ 34. When Calhoun paid Metropolitan for the bill, the amount they paid was less than the face amount of the bill. Stipulation at 13.
Calhoun or CBO sent the Metropolitan bill to patients' attorneys and the bill included a notice of sale and assignment reflecting that Calhoun owned the Metropolitan bill. Defs.' Reply 56.1, ¶¶ 70, 73. The patients' attorneys provided the bills in a demand package to the insurance carriers. Defs.' 56.1, ¶ 3. Calhoun and CBO knew the bills were delivered to patients' attorneys and were to be included in a demand package for the insurance carriers. Pl.'s Resp. 56.1, ¶ 69.[5]
State Farm is a domestic insurer. Stipulation at 13. State Farm settled claims with patients who were provided health care services by Calhoun and Metropolitan. TAC Exs. 1, 10.[6] Upon receipt of the demand package from a patients' attorneys, State Farm adjusters evaluated several factors in determining whether to settle individual claims, including but not limited to, policy limits, all the facts and circumstances surrounding the injury and accident, including percentage fault, whether there's a permanent impairment, past and future medical bills and past and future pain and suffering. Stipulation at 14; Defs.' 56.1, ¶¶ 8, 23. State Farm's claims handlers prepared a claim file containing information about the injury, damages, strengths and weaknesses for negotiation, and any unusual or aggravating circumstances. Defs.' 56.1, ¶ 10. When evaluating medical bills, State Farm's adjusters considered the reasonableness of *1298 the charges. Id. at ¶ 16. Sometimes Calhoun's bills were reduced. Id. at ¶ 20.
After the claims were evaluated, State Farm negotiated a lump sum settlement payment with patients' attorneys. Stipulation at 14. State Farm did not allocate how the settlement should be distributed between the patient, the attorney, and the medical providers. Defs.' 56.1, ¶ 29; Pl.'s Resp. 56.1, ¶ 29. Defendants were not involved in the settlement negotiations between the patients' attorneys and State Farm. Defs.' 56.1, ¶ 30. Calhoun received payments only after a settlement. Id. at ¶ 4. The patients' attorneys made the checks payable to Calhoun and the checks were deposited directly into Calhoun's bank account. Id. at ¶ 4. Calhoun negotiated with the patients' attorneys on a case-by-case basis regarding what it would accept from the settlement as payment for the Calhoun and Metropolitan bills. Id. at ¶ 31.
On March 12, 2013, State Farm's Multi-Claim Investigative Unit ("MCIU") learned that Calhoun was listed as the guarantor on the Metropolitan account ledger for a claim. Id. at ¶ 36; Pl.'s Resp. 56.1, ¶ 36. In July 2013, MCIU began "Project Calhoun" to investigate the Arrangement. Defs.' 56.1, ¶¶ 32, 37. In November 2013, an initial Alert was distributed within State Farm regarding Project Calhoun. Id. at ¶ 45. State Farm learned of the price list that set the amounts Calhoun paid Metropolitan for specific procedures and in March 2014, State Farm obtained a copy. Defs.' 56.1, ¶ 48; Pl.'s Resp. 56.1, ¶ 48. State Farm transitioned all of the claim files involving Calhoun and Metropolitan to MCIU for review. Defs.' 56.1, ¶ 50.
In the TAC, State Farm alleges three counts against Defendants: (1) violations of the FDUTPA, (2) common law fraud, and (3) unjust enrichment.[7]
II. LEGAL STANDARD
Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ; Fed R. Civ. P. 56. A genuine issue of material fact exists when "a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "For factual issues to be considered genuine, they must have a real basis in the record." Mann v. Taser Int'l, Inc. , 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted). Speculation or conjecture cannot create a genuine issue of material fact sufficient to defeat a well-supported motion for summary judgment. Cordoba v. Dillard's, Inc. , 419 F.3d 1169, 1181 (11th Cir. 2005).
The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. Clark v. Coats & Clark, Inc. , 929 F.2d 604, 608 (11th Cir. 1991). In assessing whether the moving party has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party. Denney v. City of Albany , 247 F.3d 1172, 1181 (11th Cir. 2001). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. Bailey v. Allgas, Inc. , 284 F.3d 1237, 1243 (11th Cir. 2002) ; see also Fed. R. Civ. P. 56(e). "If *1299 reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc. , 975 F.2d 1518, 1534 (11th Cir. 1992). But if the record, taken as a whole, cannot lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
III. APPLICABLE LAW
A. Patient Brokering Statute, Fla. Stat. § 817.505 (2012)
The Patient Brokering Statute prohibits offering or paying any "commission, bonus, rebate, kickback, or bribe, directly or indirectly in cash or in kind" or engaging "in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility." Fla. Stat. § 817.505(1)(a). It is also unlawful for any person to "[s]olicit or receive any commission, bonus, rebate, kickback, bribe, directly or indirectly, in cash or in kind" or engage in any "fee-split arrangement" in return for referring patients to or from a health care provider. Id. § 817.505(1)(b). It is also unlawful to aid, abet, advise, or otherwise participate in the conduct prohibited by the statute. Id. § 817.5050(1)(d).
B. Anti-Kickback Statute, Fla. Stat. § 456.054 (2012)
The Anti-Kickback Statute makes it "unlawful for any health care provider ... to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." Fla. Stat. § 456.054(2). A kickback is "remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an incentive or inducement to refer patients for past or future services or items. Id. § 456.054(1). "Violations of [ section 456.054 ] shall be considered patient brokering and shall be punishable as provided in s. 817.505." Id. § 456.054.
C. Anti-Rebate Statute, Fla. Stat. § 395.0185 (2012)
Pursuant to the Anti-Rebate Statute, it is "unlawful for any person to pay or receive any commission, bonus, kickback, or rebate or engage in any split-fee arrangement, in any form whatsoever, with any physician, surgeon, organization, or person, either directly or indirectly, for patients referred to a licensed facility." Fla. Stat. § 395.0185(1).
D. Insurance Fraud Statute, Fla. Stat. § 817.234(a)(1) - (2), (6), (12) (2012)
Under Florida Law a person commits insurance fraud if that person, with the intent to injure, defraud, or deceive any insurer presents or causes to be presented any written statement as part of, or in support of, a claim for payment pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim. Fla. Stat. § 817.234(1)(a)(1). Further, a person commits insurance fraud if that person, with the intent to injure, defraud or deceive any insurer prepares or makes any written statement that is intended to be presented to any insurer in connection with, or support of, any claim for payment pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning the claim. Id. § 817.234(1)(a)(2). A statement includes but is not limited to, any notice, statement, proof of loss, invoice, account, bill for services or other *1300 evidence of loss, injury or expense. Id. § 817.234(6).
E. The Health Care Clinic Act, Fla. Stat. § 400.9905(4), § 400.9935(3) (2012)
The Health Care Clinic Act ("HCCA") requires health care clinics to be licensed by the Agency for Health Care Administration ("AHCA") unless they qualify for an exemption. See Fla. Stat. § 400.991 (2012) ; State Farm Fire & Cas. Co. v. Silver Star Health & Rehab , 739 F.3d 579, 582 (11th Cir. 2013). " 'Clinic' means an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services." Fla. Stat. § 400.9905(4). The term clinic does not include entities that fall within one of the enumerated exemptions in sections 400.9905(4)(a)-(n) of the Florida statutes. One exemption under the HCCA applies to clinics that are wholly owned by one or more licensed health care practitioners" and states as follows:
A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners [...] and that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws .
Id. § 400.9905(4)(g) (emphasis added). A clinic that does not qualify for the wholly owned exemption, and does not otherwise have a license, operates unlawfully under Florida law. State Farm Mut. Auto. Ins. Co. v. First Care Sol., Inc. , 232 F.Supp.3d 1257, 1267 (S.D. Fla. 2017) ; Silver Star , 739 F.3d at 582. "A charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed ... is an unlawful charge and is noncompensable and unenforceable." Fla. Stat. § 400.9935(3).
F. FDUTPA
To prevail on a FDUTPA claim, a plaintiff must show (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. Hucke v. Kubra Data Transfer, Corp. , 160 F.Supp.3d 1320, 1328 (S.D. Fla. 2015). "A deceptive act or practice is 'one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' " Hucke , 160 F.Supp.3d at 1328. To satisfy the first element of the FDUTPA claim, a party may allege either a traditional or per se violation. Felice v. Invicta Watch Co. of Am., Inc. , No. 16-CV-62772, 2017 WL 3336715, at *2 (S.D. Fla. Aug. 4, 2017).
To establish a traditional FDUTPA violation, plaintiff must show defendants engaged in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1) ; Feheley v. LAI Games Sales, Inc. , No. 08-cv-23060, 2009 WL 2474061, at *5 (S.D. Fla. Aug. 11, 2009).
A per se violation is established in one of two ways: (1) if the "law, statute, rule, regulation, or ordinance" expressly constitutes a violation of the FDUTPA or (2) the statute, rule or ordinance proscribes unconscionable, deceptive, or unfair acts or practices and therefore operates as an implied FDUTPA predicate. Fla. Stat. § 501.203(3)(c) ; Parr v. Maesbury Homes, Inc. , No. 09-cv-1268, 2009 WL 5171770, at *7 (M.D. Fla. Dec. 22, 2009). Though a violation of a predicate statute satisfies the first element of the FDUTPA claim, a *1301 party is still required to plead causation and damages. Parr , 2009 WL 5171770, at *8.
G. Common Law Fraud
To prevail on a common law fraud claim, a plaintiff must prove 1) a false statement concerning a specific material fact; 2) the speaker's knowledge that the representation is false; 3) an intention that the representation induces another's reliance; and 4) consequent injury to the other party acting in reliance on the representation. Democratic Republic of the Congo v. Air Capital Grp., LLC , No. 12-cv-20607, 2013 WL 3223686, at *4 (S.D. Fla. June 24, 2013). In certain circumstances, "[f]raud also includes the intentional omission of a material fact." Ward v. Atl. Sec. Bank , 777 So.2d 1144, 1146 (Fla. Dist. Ct. App. 2001).
H. Unjust Enrichment
To prevail on an unjust enrichment claim, a plaintiff must show: (1) a benefit was conferred on the defendant by the plaintiff; (2) that defendant voluntarily accepted and retained the benefit; and (3) that it would be inequitable for defendant to retain the benefit. See Johnson v. Catamaran Health Sols., LLC , 687 F. App'x 825, 830 (11th Cir. 2017).
IV. DISCUSSION
State Farm moves for partial summary judgment on the FDUTPA and unjust enrichment claims. Defendants move for summary judgment on all of State Farm's claims. For the reasons set forth below, State Farm's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART and Defendants' Motion for Summary Judgment is DENIED.
A. State Farm's Motion for Partial Summary Judgment
State Farm moves for summary judgment arguing that (1) Calhoun and Metropolitan's Arrangement is prohibited by Florida law and public policy; (2) Calhoun made material misrepresentations and omitted material facts in violation of the Insurance Fraud Statute; (3) allowing Calhoun to retain its unlawful kickback violates public policy; (4) summary judgment is appropriate because Calhoun operated in violation of the HCCA; (5) State Farm is therefore entitled to summary judgment on the FDUTPA claim; and (6) State Farm is entitled to summary judgment on its unjust enrichment claim.
1. Did the Arrangement Violate the Patient Brokering Statute, Anti-Kickback Statute and Anti-Rebate Statute?
State Farm argues that the Arrangement violated several Florida statutes that regulate the practice of medicine in contravention of public policy. Specifically, State Farm argues that Defendants violated the Patient-Brokering, Anti-Kickback, and Anti-Rebate Statutes.
The Parties dispute whether the remuneration Calhoun received as its share of settlements constitutes a kickback. A "kickback" is a payment made pursuant to an agreement by a provider of health care services of a portion of the charges for services rendered to a referring health care provider as incentive to refer patients for future services. Fla. Stat. § 456.054(1).
State Farm argues that Calhoun referred patients to Metropolitan in exchange for receiving a kickback -ability to use the inflated Metropolitan bill to increase the amount that Calhoun received from patients' settlements. State Farm contends that Calhoun received as an unlawful kickback the difference between the settlement proceeds it received and the sum of its professional fees and the amount it paid to Metropolitan. For example, State Farm paid a settlement amount of $50,000 for Claim No. 59-A715-266. From this $50,000, Calhoun received *1302 $30,000. State Farm argues that only Calhoun's professional fees in the amount of $6,339.20 and Metropolitan's negotiated reduced bill of $2500 were recoverable. The remaining $21,160.80 represented a kickback. Pl.'s Mot. at 6-8.
Defendants argue that issues of fact remain as to whether Calhoun in fact received a kickback because the evidence shows that, in some instances, Calhoun did not receive any sort of kickback as it was not even fully compensated for its own surgical charges. Defs.' Resp. at 5.
Indeed, although there are instances where Calhoun received a windfall as a result of the Arrangement, there are also instances where Calhoun did not even recover the amount of its own costs let alone recoup what it paid for a Metropolitan bill. See TAC, Ex. 1. For example, in Claim No. 59325M493, Calhoun's surgical charges were $24,890.40 but the entire claim settled for only $20,000.00. TAC, Ex. 1. In that example, Calhoun did not even recoup its own surgical charges let alone recoup anything on Metropolitan's charges for the use of its surgical facility. Drawing every inference in favor of Defendants, the Court cannot conclude as a matter of law that Calhoun received a kickback as a result of the Arrangement.
State Farm also argues that Calhoun purchased Metropolitan's account receivables in exchange for illegitimate patient referrals and the Arrangement as a whole was an unlawful split-fee arrangement for the purpose of referrals.[8] Defendants argue that Metropolitan's bill was not provided to Calhoun for the purpose of inducing referrals but was to enable Calhoun to provide treatment to patients who did not have medical insurance or the ability to pay for recommended surgeries that were designated as "elective." Defendants also argue that the Arrangement reflected the risk that Calhoun assumed because it was possible that Calhoun would not be timely paid timely or paid at all following the surgeries.[9]
Here, Calhoun and Metropolitan had an agreement whereby Calhoun physicians would perform surgeries at Metropolitan's facilities. A reasonable jury could find that the purpose of the Arrangement was to enable Calhoun to collect on Metropolitan's bills rather than to induce referrals. A reasonable jury could also find the opposite. See United States. v. Marder , 208 F.Supp.3d 1296, 1317 (S.D. Fla. 2016) (denying summary judgment on issue of whether defendants paid or obtained remuneration in exchange for referrals and, if so, whether the conduct was willful); State v. Rubio , 967 So.2d 768, 779 (Fla. 2007) (while addressing the constitutionality of the Patient-Brokering Statute, Section 817.505, the Court stated that "[w]hether on those dates the defendants actually did take part in a split-fee arrangement in return for the referral of patients is a question for the trier of fact"). Accordingly, summary judgment is inappropriate.
*1303 2. Did the Arrangement Violate the Insurance Fraud Statute?
State Farm argues that Calhoun violated the Insurance Fraud Statute by failing to disclose (1) that Calhoun purchased the Metropolitan bills for less than the amount of the bills and (2) that Metropolitan accepted Calhoun's payment as payment in full for each patient account and was not owed anything at the time the demand was sent to State Farm. Defendants argue factual issues remain regarding the fraud claim.
State Farm argues that Defendants had a "statutory obligation of completeness" to provide all material information.[10] Defendants contend there is no such statutory obligation and argue that they had no duty to disclose the nature of the Arrangement. State v. Mark Marks, P.A. , 698 So.2d 533, 539 (Fla. 1997).
Defendants' reliance upon Mark Marks is misplaced. The Supreme Court of Florida in Mark Marks only addressed an attorney's duty to disclose. Specifically, the Court held that "an attorney's duty to disclose is uncertain under section 817.234(1)" because "it is an attorney's unique obligations when viewed in conjunction with the term 'incomplete' that renders [the] statute vague as applied to attorneys." Id. at 537. Indeed, in Sammy Sterling Holdings, LLC v. United States Aircraft Ins. Grp. , this Court distinguished between an attorney's duty to disclose and an insurer's duty to disclose stating that "an insurer has no such countervailing duties that might blur the extent of its obligations under section 817.234(7)." No. 16-cv-21230, 2016 WL 8679130, at *6 (S.D. Fla. Jun. 23, 2016). Accordingly, the Supreme Court of Florida's holding in Mark Marks about an attorney's duty to disclose has no bearing on whether Defendants, health care providers, had a duty to disclose.
Section 817.234 imposes a duty of disclosure as it explicitly prohibits preparing or making any written statement that is intended to be presented to any insurer in connection with any claim for payment or other benefit pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or misleading information concerning any fact material to that claim. Fla. Stat. § 817.234(1)(a)(2).
As to the alleged omissions and misrepresentations, this is a highly factual inquiry that is generally left for the finder of fact. See Rose v. ADT Sec. Servs., Inc. , 989 So.2d 1244, 1247 (Fla. Dist. Ct. App. 2008) ("[A]s a general rule, summary judgment is not appropriate to resolve a fraud claim under Florida law."); State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc. , 06-cv-1757, 2008 WL 11333443, at *11 (M.D. Fla. Dec. 24, 2008) ("Whether the Defendants made false statements of material fact is a genuine issue of material fact which is not appropriate for summary judgment."). Because the Court finds that issues of fact remain regarding Defendants' intent, whether the statements were misleading, and whether the statements and omissions were material, summary judgment is inappropriate.
3. Did the Kickback Violate Public Policy?
State Farm argues that "split fee" arrangements are clearly in contravention of *1304 public policy, as evidenced by the Patient Brokering, Anti-Kickback, and Anti-Rebate Statutes. In essence, State Farm argues that violations of these three statutes warrant entry of summary judgment. In opposition, Defendants distinguish the cases cited by State Farm and argue that the statutes do not require Defendants to disgorge portions of the settlement payments Defendants received. As set forth above, summary judgment as to violations of these statutes is not appropriate and this public policy argument fails.
4. Did Calhoun Violate the Health Care Clinic Act?
State Farm argues that Calhoun operated in violation of the HCCA. Specifically, State Farm argues that Calhoun qualified as a clinic but did not qualify for an exemption to the licensure requirement and because it operated unlawfully, Calhoun's charges are noncompensable and unenforceable.
a. Did Calhoun Qualify as a Clinic?
Under the HCCA, " '[c]linic' means an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services." Fla. Stat. § 400.9905(4). It is undisputed that Calhoun provided health care services to individuals. The Parties dispute, however, whether Calhoun tendered charges for reimbursement for its services.
State Farm argues that Calhoun submitted bills to third parties, such as patients' PIP or out-of-network insurance providers, for direct reimbursement and that this satisfies the "tender charges" requirement of the HCCA. Defendants deny that Calhoun tendered charges for reimbursement for health care services arguing that Calhoun never received payments from PIP insurers because the bills were submitted to the patients' attorneys and not directly to the insurance companies. Defs.' Reply 56.1, ¶ 60.[11]
A review of the record, including the PIP lawsuits filed by Calhoun seeking reimbursement from third party insurers, and Calhoun's own attestation that it generally did not submit bills for payment, support the conclusion that Calhoun was a "clinic" within the meaning of the HCCA. See Order on Judicial Notice dated April 24, 2018 (granting State Farm's Request to take judicial notice of 106 PIP lawsuits);[12] Pl.'s 56.1, ¶ 9; Defs.' Resp. 56.1, ¶ 9 ("Calhoun, generally did not submit bills for any treatment to patients' personal injury protection."). It is clear from the record that Calhoun qualifies as a clinic.
b. Did Calhoun Qualify for the Wholly Owned Exemption?
Because Calhoun was a "clinic" within the meaning of the HCCA, Calhoun was *1305 required to be licensed unless it qualified for an exemption. State Farm moves for summary judgment arguing that Calhoun did not qualify for the wholly owned exemption because Calhoun was not properly supervised. Defendants argue that the wholly owned exemption is only contingent upon ownership and not any level of supervision. In relevant part, the HCCA reads:
A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners [...] and that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws .
Fla. Stat. § 400.9905(4)(g) (emphasis added). The Parties do not dispute that Calhoun was wholly owned by licensed practitioners-the owners were all licensed chiropractors. The dispute here hinges on the interpretation of the HCCA's requirement pertaining to supervision. State Farm argues that Section 400.9905(4)(g) imposes a requirement of supervision upon wholly owned clinics. Defendants argue that the modifying phrase-pertaining to supervision-merely explains that when a practice is "jointly owned" with an unlicensed person, it must be the licensed provider who is legally responsible.
The Court has already decided the issue. See Order on Mot. to Dismiss SAC at 14-17. A wholly owned clinic is not exempt from the HCCA's licensing requirement if it is not supervised in accordance with the HCCA. See, e.g. , State Farm Mut. Auto. Ins. Co. v. Miami Med. Care Ctr., Inc. , No. 15-cv-22660, 2016 WL 6962872, at *2 (S.D. Fla. Nov. 29, 2016) ("If the health care practitioner fails to supervise the clinic's business activities or does not remain responsible for legal compliance, then the clinic does not lawfully qualify for the exemption."). Thus, Calhoun qualifies for an exemption under Section 400.9905(4)(g) if one of the owners, a licensed health care practitioner, supervised the business activities and was legally responsible for Calhoun's compliance with federal and state laws.
State Farm argues that none of Calhoun's owners supervised the clinic. Defendants disagree and rely upon the Declaration of Dr. Cereceda (ECF No. 230-8) and the Transcript of Dr. Triana (ECF No. 230-11) to demonstrate that the owners supervised the clinic. Issues of fact regarding supervision remain.
Upon a review of the record, it is unclear whether Dr. Cereceda supervised the practice. Dr. Cereceda testified that he was an owner but did not do "a whole lot" nor did he "do the day-to-day operations." Deposition of Mark Cereceda ("Cereceda Dep.") (ECF No. 230-9) at 137:24-138:1. Dr. Cereceda did not even know who supervised the daily activities at the clinic let alone supervise them himself. Cereceda Dep. at 106:3-6. Additionally, Dr. Cereceda testified that he did not even know if Calhoun had a compliance department. Cereceda Dep. Ex. 9 at 196:9-12. Dr. Cereceda even identified Dr. Mevorah as the sole manager, "solely responsible ... for conducting and overseeing the affairs and operations of Calhoun (including through the delegation of duties, tasks and functions) ..." Cereceda Interrogatory ("Cereceda Interrog."). (ECF No. 214-1) at 5. However, Dr. Cereceda subsequently stated in a Declaration that he did in fact "constantly stay abreast of and oversee Calhoun's business affairs." Cereceda Decl. (ECF No. 230) at 10.[13] Here, "any question *1306 of credibility or weight to be given to the evidence resulting from variances between an affidavit and deposition is a question of fact for the trier of fact." Tippens v. Celotex Corp. , 805 F.2d 949, 951 (11th Cir. 1986).
Dr. Mevorah was designated the managing member to run the business of Calhoun. Mevorah Dep. at 75:12-14. Dr. Mevorah's role was to "conduct/oversee the affairs and operation of Calhoun (including through the delegation of duties, tasks and functions);" however, his involvement changed over time. Mevorah Interrog. at 5. Dr. Mevorah testified that "[w]hen we first started I had the most knowledge of the running of an orthopedic practice, so my input may have been greater for the first couple of months until we hired professional staff to take over the duties." Mevorah Dep. at 74:3-12. After the first few months, Dr. Mevorah's role became primarily oversight of the physicians and some involvement with recruiting doctors. Id. at 78:2-8. The day-to-day operations were all delegated. Id. at 76:2-19. Based on the record, it is unclear whether Dr. Mevorah supervised the clinic following the initial stages of the clinic's inception. This is a factual inquiry for the jury. Accordingly, summary judgment as to the alleged violation of the HCCA is inappropriate.
5. The FDUTPA Claim
State Farm moves for summary judgment on Defendants' per se and traditional violations under the FDUTPA. At the motion to dismiss stage, the Court found that State Farm satisfied the first element of the FDUTPA claim by alleging a traditional violation but did not address whether violations of the statutes at issue constituted per se violations. Order on Mot. to Dismiss Am. Compl. at 27.
A per se violation is established in one of two ways: (1) if the "law, statute, rule, regulation, or ordinance" expressly constitutes a violation of the FDUTPA, or (2) if the statute, rule or ordinance proscribes unconscionable, deceptive, or unfair acts or practices and therefore operates as an implied FDUTPA predicate. Felice , 2017 WL 3336715, at *2 ; Parr , 2009 WL 5171770, at *7. When the statute at issue is a predicate statute, plaintiff need not allege the first element of the FDUTPA claim. Parr , 2009 WL 5171770, at *8. However, even if a statute is a per se FDUTPA predicate, a plaintiff must allege causation and damages. Id.
Here, State Farm argues that Defendants' are liable under FDUTPA based on violations of the Patient Brokering Statute, Anti-Kickback Statute, Anti-Rebate Statute, Insurance Fraud Statute, and the HCCA. Because these statutes do not expressly state that they may serve as predicate statutes for the FDUTPA, the Court looks at whether they proscribe deceptive or unfair practices. Hucke , 160 F.Supp.3d at 1328. The FDUTPA provides for a civil cause of action for "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "A deceptive act is one that is likely to mislead consumers [and] [a]n unfair practice is one that offends established public policy and that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."
*1307 Millenium Labs., Inc. v. Universal Oral Fluid Labs., LLC , No. 11-cv-1757, 2012 WL 12905083, at *7 (M.D. Fla. Apr. 25, 2012).
A violation of the HCCA may serve as a statutory predicate for a per se FDUTPA violation. State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc. , 103 F.Supp.3d 1343, 1354 (S.D. Fla. 2015) ("The Court finds that there is no genuine issue of material fact as to whether Defendants violated the FDUTPA. Defendants engaged in unfair and deceptive acts and practices in the conduct of their trade and commerce by unlawfully operating medical clinics, in violation of Florida law.").
The Insurance Fraud Statute may also serve as a predicate offense under the FDUTPA. See Gov't Employees Ins. Co. v. KJ Chiropractic Ctr. LLC , No. 12-cv-1138, 2013 WL 12155947, at *6 (M.D. Fla. Oct. 23, 2013), report and recommendation adopted , No. 12-cv-1138, 2014 WL 12617566 (M.D. Fla. Mar. 6, 2014) (Discussing various statutes, including Florida's Insurance Fraud Statute, Section 817.234, the court stated "[p]laintiffs are not seeking relief under these statutes; they are citing the alleged violation of these statutes as support for their claim under FDUPTA [sic ]. This is sufficient.").
Both the Patient Brokering and Anti-Kickback Statutes can serve as predicate statutes for the FDUTPA claim as well. See Millenium Labs. , 2012 WL 12905083, at *5 (holding Plaintiff's FDUTPA claim predicated on violation of Florida's Anti-Kickback and Patient Brokering Statutes survived dismissal).[14] Additionally, the conduct proscribed by the Anti-Rebate Statute is similar to the conduct addressed in the Anti-Kickback and Patient-Brokering Statutes. Upon a review of the Anti-Rebate Statute, the statute serves as an implied FDUTPA predicate because it proscribes conduct that the FDUTPA also seeks to protect against.[15] See MJS Music Publ'ns., LLC v. Hal Leonard Corp. , No. 6-cv-488, 2006 WL 1208015, at *2 (M.D. Fla. May 4, 2006) ("[W]hen considering whether a defendant's actions support a finding of 'unfair methods of competition, unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce,' courts have regarded the concept as 'extremely broad.' ").
State Farm moves for summary judgment on its FDUTPA claim arguing that (1) Defendants did not disclose the nature of the Arrangement, giving the false impression that the injured claimant owed Metropolitan the full face amount of the Metropolitan bill; (2) Calhoun's bills were noncompensable and unenforceable because Calhoun operated in violation of the HCCA; and (3) Defendants' submission of unlawful bills for payments is a deceptive and unethical practice. Issues of fact remain regarding the nature of the Arrangement such that summary judgment on each of the predicate offenses is precluded. Further, issues of fact remain regarding *1308 whether Calhoun qualifies for the wholly-owned exemption under the HCCA. Thus, summary judgment on State Farm's FDUTPA claim is inappropriate.
6. The Unjust Enrichment Claim
State Farm moves for summary judgment on its unjust enrichment claim, arguing that (1) Calhoun was not legally entitled to any payments for its services rendered because it operated in violation of the HCCA; (2) each claim submitted was the product of Defendants' unlawful conduct; and (3) it would be inequitable for Defendants to retain money that State Farm paid for Metropolitan's billed charges because they were in violation of the predicate statutes. State Farm, seeks disgorgement of any payments Defendants received pursuant to the Arrangement for the claims identified. See TAC, Ex. 1.
As discussed supra, if Calhoun is not exempt from the HCCA's licensing requirement, it operated unlawfully. See Silver Star , 739 F.3d at 582. The Eleventh Circuit has held that an insurer may bring an unjust enrichment claim on the grounds that an unlicensed clinic "accept[ed] and retain[ed] benefits that it [was] not legally entitled to receive. Id. at 584. Because issues of fact remain regarding whether Calhoun was exempt from the licensing requirements and whether State Farm conferred a benefit upon Defendants summary judgment is denied. See Henry M. Butler, Inc. v. Trizec Props., Inc. , 524 So.2d 710, 712 (Fla. Dist. Ct. App. 1988) ("It is axiomatic that there must be a benefit conferred before unjust enrichment exists.").
State Farm argues that the Arrangement was unlawful and Defendants should disgorge payments they received. Pl.'s Mot. at 19. Alternatively, State Farm states that if the conduct does not support full disgorgement, State Farm is entitled to the difference between what Defendants received from the proceeds of settlement and the amount Calhoun paid to Metropolitan as payment in full. TAC, ¶168.
The Patient Brokering and Anti-Kickback Statutes prohibit receipt of any kind of payment "directly or indirectly" for mere referral of a patient as well as any split-fee arrangement "in any form whatsoever." Fla. Stat. § 817.505 (1)(b). If the Patient Brokering and Anti-Kickback Statutes were violated, then the kickback or split fee was unlawful and Defendants are not entitled to the excess payment based on the referral or split-fee arrangement. See Gov't Emps. Ins. Co. v. Clear Vision Windshield Repair, LLC , No.16-cv-2077, 2017 WL 1196438, at *5 (M.D. Fla. Mar. 29, 2017) (finding that the "Plaintiffs' remedy is unjust enrichment" where defendants submitted fraudulent bills to an insurer after "the insureds assigned to Defendants the payment owed to the insureds under the insurance agreement"); Med. Mgmt. Group of Orlando, Inc. v. State Farm Mut. Auto. Ins. Co. , 811 So.2d 705, 706 (Fla. Dist. Ct. App. 2002) (affirming summary judgment ruling that defendant was not obligated to pay MRI charges that were illegal under section 817.505, and explaining "we agree with the trial judge that the arrangement is nothing more than a fee-splitting scheme to compensate for MRI referrals prohibited by section 817.505"); see also NuWave Diags., Inc. v. State Farm Mut. Auto. Ins. Co. , Case No. 97-09174, 6 Fla. L. Weekly Supp. 522a (Broward County Ct. May 7, 1999) ("Any such split-fee arrangement-especially the very disproportionate one involved in the present case-is against the public policy of this state and is also specifically prohibited by section 817.505.").
As discussed supra , issues of fact remain regarding whether Defendants violated the Anti-Kickback Statute and Patient *1309 Brokering Statute, thus summary judgment is inappropriate.
B. Defendants' Motion for Summary Judgment
Defendants move for summary judgment arguing that (1) State Farm's knowledge of the Arrangement precludes any insurance claims settled after the date State Farm learned of the Arrangement; (2) State Farm's knowledge precludes the FDUTPA claim because State Farm cannot show causation; (3) State Farm cannot prove actual damages; (4) State Farm cannot establish that Defendants had a duty to disclose; (5) State Farm's fraud claim fails because Calhoun and Metropolitan bills were mere opinions; (6) State Farm's unjust enrichment claim fails because any purported benefit conferred on Defendants CBO, Dr. Cereceda, and Dr. Mevorah would merely be indirect; and (7) Calhoun is not subject to the HCCA's licensing requirement because they are wholly owned by health care practitioners. For the reasons that follow, Defendants' Motion is denied.
1) Did State Farm have Actual Knowledge of the Agreement?
Defendants argue they are entitled to summary judgment because State Farm was aware of the Arrangement while it settled a number of claims at issue; therefore State Farm did not rely on the face amount of the bills. State Farm argues that it relied on the Calhoun and Metropolitan bills in settling claims, citing sworn declarations of claims personnel who were ultimately responsible for settling the claims as support. Pl.'s Resp. at 5.[16]
The Parties dispute precisely when State Farm had knowledge of the Arrangement. For example, in July 2013, State Farm's MCIU officially opened "Project Calhoun" to investigate the Arrangement. Defs.' 56.1, ¶ 37. In November 2013, an alert was distributed within State Farm regarding Project Calhoun. Id. at ¶ 45. In February 2014, State Farm learned of the price list that set the amounts Calhoun paid Metropolitan for specific procedures. Id. at ¶ 48. On March 31, 2014 State Farm obtained a copy of the price list. Id. In April 2014, State Farm continued its efforts to notify all section managers, team managers, and claims handlers about Project Calhoun. Id. at ¶ 49. Consequently, there are several dates from which a jury could conclude State Farm had knowledge. Thus, summary judgment is inappropriate.
2) Does State Farm's Alleged Knowledge Preclude the FDUTPA Claim?
Defendants argue that State Farm failed to establish causation because State Farm knew of the Arrangement and adjusted its claims accordingly. As State Farm argues however, the FDUTPA requires only an objective inquiry because injury "is not determined by the plaintiffs' subjective reliance on the alleged inaccuracy." Carriuolo v. Gen. Motors Co. , 823 F.3d 977, 983, 985-86 (11th Cir. 2016) ; Vazquez v. Gen. Motors, LLC , No. 17-cv-22209, 2018 WL 447644, at *7 (S.D. Fla. Jan. 16, 2018) (Because the FDUTPA requires only an objective inquiry, it is immaterial *1310 whether plaintiff relied on defendant's deceptive act or unfair practice). Indeed, a "party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." Carriuolo , 823 F.3d at 984. Thus, State Farm's knowledge has no bearing on the FDUTPA claim.
3) Can State Farm Prove Actual Damages? [17]
Defendants move for summary judgment arguing that State Farm cannot prove actual damages. State Farm argues that the record establishes that Defendants' deceptive and unfair conduct caused State Farm harm.
Under the FDUTPA, actual damages are measured according to the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered. Carriuolo , 823 F.3d at 986 ; Rollins, Inc. v. Heller , 454 So.2d 580, 585 (Fla. Dist. Ct. App. 1984). In other words, a plaintiff must prove the gap in value between what was promised and what was delivered. Democratic Republic of the Congo v. Air Capital Group, LLC, 614 F. App'x at 472 (11th Cir. 2015). "Although 'speculation and guesswork' should not be the basis for ascertaining damages, damages need not be calculated by mathematical precision." United States v. Killough , 848 F.2d 1523, 1531 (11th Cir. 1988). "The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data." G.M. Brod & Co. v. U.S. Home Corp. , 759 F.2d 1526, 1539 (11th Cir. 1985).
Defendants argue that State Farm's knowledge is fatal to State Farm's ability to assert actual damages. However, the law is clear that the "FDUTPA recovery depends on whether plaintiffs paid a price premium, not on whether plaintiffs actually relied on the illegal misrepresentation." Carriuolo , 823 F.3d at 986.
Next, Defendants argue that State Farm's damages theory translates to a "had we known, we could have settled for less" theory of harm, which is not a basis for actual damages. As stated above, actual damages are calculated based on the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered. Id. ; Rollins , 454 So.2d at 585. The proof may be indirect and it may include estimates based on assumptions, so long as the assumptions rest on adequate data. G.M. Brod & Co. , 759 F.2d at 1539. Extending these principles, State Farm offers evidence detailing a basis for damages, including an "Auto Injury Evaluation" that documents the reimbursement amounts the claims personnel determined to be reasonable for Calhoun's bills. Pl.'s Resp., Ex. B.
Defendants also argue that even crediting State Farm's unlicensed medical clinic theory, State Farm cannot prove damages because there is no record evidence of how much weight or consideration State Farm gave to Calhoun's charges as part of the overall lump-sum settlement amount. Defs.' 56.1, ¶ 23. Courts find that if a defendant engages in an unfair and deceptive act by unlawfully operating a medical clinic, then the unlawful operation of the clinic would have resulted in harm to plaintiffs, insureds, and the public as a whole. See *1311 Med. Serv. Ctr. of Fla., Inc., 103 F.Supp.3d at 1354-55.
All questions regarding the reasonableness and quantification of damages are generally issues of fact. Exim Brickell LLC v. PDVSA Servs. Inc. , 516 F. App'x 742, 759 (11th Cir. 2013). Here, the issues of reasonableness and quantification of damages should be left to the jury.
4) Did Defendants have a Duty to Disclose the Arrangement?
Defendants argue State Farm cannot establish that Defendants had a duty to disclose. State Farm contends that Defendants have carried over their purely legal argument noting that the Court considered and expressly rejected Defendants' position. As discussed previously, Defendants had a duty to disclose. Nonetheless, summary judgment is inappropriate because issues of fact remain regarding Defendants' intent, whether the statements were misleading, and whether the statements and omissions were material.
5) Were the Metropolitan Bills Mere Opinions?
Defendants argue that the bills were mere opinions not actionable under a fraud theory. State Farm contends Defendants' argument remains as preposterous as when Defendants raised it in their Motion to Dismiss. The Court previously rejected Defendants' argument noting that a medical bill can be fraudulent or deceptive. Order on Mot. to Dismiss SAC at 22 n. 16; Progressive Select Ins. Co. v. Fla. Hosp. Med. Ctr. , 236 So.3d 1183, 1191 (Fla. Dist. Ct. App. 2018) (noting "medical care providers are prohibited from rendering any bill for services that is false or fraudulent"). Summary judgment is inappropriate because issues of fact remain regarding Defendants' intent, whether the statements were misleading, and whether the statements and omissions were material.
6) Did CBO, Dr. Cereceda, and Dr. Mevorah Receive a Benefit?
Defendants contend State Farm did not confer a benefit on CBO, Dr. Mevorah, or Dr. Cereceda because they were not party to State Farm's settlement with the accident victims. State Farm argues that Defendants' only factual support is supplied by self-serving declarations from Dr. Cereceda and Dr. Mevorah.
To establish unjust enrichment, a plaintiff must show that the plaintiff conferred a direct benefit on the defendant. City of Miami v. Citigroup Inc. , 801 F.3d 1268, 1277 (11th Cir. 2015). Yet, unjust enrichment claims are not precluded "merely because the 'benefit' passed through an intermediary before being conferred on a defendant." State Farm Mut. Auto. Ins. Co. v. A & J Med. Ctr., Inc. , 20 F.Supp.3d 1363, 1368 (S.D. Fla. 2014).
Dr. Cereceda and Dr. Mevorah argue that "any financial benefit I and the other members of Calhoun may have received from such settlements was indirect i.e. , paid to us by virtue of being a member of Calhoun, and only to the extent Calhoun generated a profit based on revenue received from all sources after payment of expenses." Cereceda Decl. (ECF No. 219-1), ¶ 11; Mevorah Decl. (ECF No. 219-2), ¶ 11. Though the funds passed through an intermediary, this does not destroy the unjust enrichment claim. In State Farm v. Kugler , the court stated, "[w]hile State Farm may not have disbursed the $13 million paid on allegedly fraudulent ... claims directly to the medical defendants, it is reasonable to infer that the defendants benefitted from the fraudulent scheme alleged in the complaint when the patient's attorney collected first and third party settlement monies from State Farm and disbursed the proceeds directly to all medical lienors on the patient's behalf."
*1312 No. 11-cv-80051, 2011 WL 4389915, at *12 (S.D. Fla. Sept. 21, 2011). Here, it is undisputed that Dr. Cereceda and Dr. Mevorah owned Calhoun. Cereceda Decl., ¶ 1; Mevorah Decl., ¶ 1. Thus, "[i]t can reasonably be inferred that individuals intimately involved with the organization and operation of the entity that directly received a benefit have benefitted themselves so as to support a claim for unjust enrichment against them 'in their individual capacities.' " See State Farm Mut. Auto. Ins. Co. v. Physicians Grp. of Sarasota, LLC , 9 F.Supp.3d 1303, 1312 (M.D. Fla. 2014).
As to CBO, Defendants move for summary judgment arguing that CBO did not directly benefit from the settlements with State Farm. However, when defendants act in concert to unjustly obtain benefits, each can be held to have been unjustly enriched by virtue of the benefit derived from the scheme, even if the benefit was not conferred on them directly. State Farm Mut. Auto. Ins. Co. v. Brown , No. 16-cv-80793, 2017 WL 1291995, at *7 (S.D. Fla. Mar. 30, 2017). Issues of fact remain regarding whether CBO, Dr. Mevorah, and Dr. Cereceda were unjustly enriched by virtue of any benefit derived from the Arrangement.
7) Did Calhoun Qualify for the Wholly Owned Exemption?
As discussed above supra , in order to qualify for the wholly owned exemption, one of the health care practitioners who own the clinic must supervise it. The Court determined that based on the record, issues of fact remain regarding whether Calhoun was supervised.
V. CONCLUSION
For the foregoing reasons, is hereby ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment (ECF No. 216) is DENIED and Plaintiff's Motion for Partial Summary Judgment (ECF No.254) is GRANTED IN PART AND DENIED IN PART as set forth above.
DONE AND ORDERED in Chambers at Miami, Florida, this 9th day of May, 2018.

On January 4, 2017, State Farm filed this action against Calhoun, Omni Neurological, Orthopedic & Spine Center, Inc. ("Omni"), Metropolitan Health Community Services Corporation d/b/a Metropolitan Hospital of Miami ("Metropolitan"), Surgery Center Of Coral Gables, LLC d/b/a Coral Gables Surgery Center ("Coral Gables"), CBO, Dr. Cereceda, Sergio Triana, D.C. ("Dr. Triana"), and Dr. Mevorah. (ECF No. 1). State Farm filed an Amended Complaint (ECF No. 56), a Second Amended Complaint (ECF No. 173), and the final and operative Third Amended Complaint ("TAC") (ECF No. 233). All defendants were dismissed except Calhoun, CBO, Dr. Cereceda, and Dr. Mevorah. See Stipulations of Dismissal (ECF Nos. 131, 154, 171, 199); Orders of Dismissal (ECF Nos. 132, 159, 174, 201).

The Court is no stranger to the facts of this case as it has already ruled upon two motions to dismiss. See Order on Motion to Dismiss Am. Compl. ("Order on Mot. to Dismiss Am. Compl.") (ECF No. 133); Order on Motion to Dismiss Second Am. Compl. ("Order on Mot. to Dismiss SAC") (ECF No. 223). The procedural posture is unusual in that at the time of the filing of the summary judgment motions presently before the Court, State Farm had not yet filed its TAC. Because of this history, the Court herein addresses certain legal arguments that are customarily raised at the motion to dismiss stage. To the extent this Order clarifies or alters any of the Court's prior orders, this Order amends those Orders accordingly.

The facts are taken from the TAC, Plaintiff's Statement of Undisputed Facts ("Pl.'s 56.1") (ECF No. 218); Defendants' Response in Opposition ("Defs.' Resp. 56.1") (ECF No. 230); Plaintiff's Reply ("Pl.'s Reply 56.1") (ECF No. 242); Defendants' Statement of Undisputed Facts (Defs.' 56.1) (ECF No. 219), Plaintiff's Response in Opposition (Pl.'s Resp. 56.1) (ECF No. 236); Defendants' Reply ("Defs.' Reply 56.1") (ECF No. 243) and a review of the corresponding record citations and submitted exhibits.

Calhoun was formed in 2011 and stopped treating patients in early 2014. Stipulation at 13.

The Parties dispute whether Dr. Cereceda and Dr. Mevorah knew the Metropolitan bills were delivered to the patients' attorneys to be included in a demand package. Defs.' Reply 56.1, ¶ 69.

The information contained in Exhibit 1 attached to the TAC identifies the claims settled by State Farm that serve as the basis for the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and unjust enrichment claims. Exhibit 1 includes details regarding the claim number, settlement amount, date of settlement, Calhoun surgical charge, Metropolitan charge, a redacted column indicating the amount paid by Calhoun to Metropolitan per the price list, and the total surgical charges. TAC, Ex. 1. The information contained in Exhibit 10 attached to the TAC identifies the claims settled by State Farm that serve as the basis for the fraud claim. TAC, Ex. 10. Similarly, Exhibit 10 identifies the claim number, date of settlement, settlement amount, Calhoun surgical charge, Metropolitan charge, and the total surgical charges.

The Court dismissed State Farm's claim for declaratory relief without prejudice. See Order on Mot. to Dismiss SAC at 31. State Farm did not reallege the declaratory relief claim in the TAC. Thus, any arguments regarding declaratory relief are moot.

It is unclear from State Farm's briefing whether its argument on summary judgment is focused on whether the purpose of the Arrangement was to generate illegal referrals, broker patients, or split fees. Construing the facts in the light most favorable to Defendants and despite this ambiguity, issues of fact remain which are intertwined with each of the statutes allegedly violated.

Part and parcel of the "referral" analysis, the Parties also dispute whether Calhoun paid Metropolitan for its bills or whether Calhoun paid Metropolitan for its services. Defs.' Resp. at 2; Pl.'s Reply at 4. Calhoun states that the prices it paid Metropolitan were negotiated at arms-length without consideration of patient referrals and that the fixed prices were fair and reasonable compared to prices paid by Medicare and Medicaid, and also took into consideration that Calhoun was required to make prompt payments.

Because the Court previously concluded that State Farm sufficiently alleged a fraud claim based on Defendants' misrepresentations and omissions, the Court necessarily found that Defendants had a duty to disclose. See Order on Mot. to Dismiss SAC at 20-22. The analysis contained herein clarifies the Court's position and does not alter the prior determination that, at the motion to dismiss stage, State Farm sufficiently alleged a fraud claim.

Although the Court previously stated that the Eleventh Circuit "has implied that the HCCA licensing requirements only apply to entities billing third parties," the Court clarifies that the Eleventh Circuit only stated that "[g]enerally, health care clinics are required to have a license ... in order to bill insurance companies." This statement does not imply that the HCCA licensing requirements apply only to entities billing third parties. The Court clarifies that it looks only to the words of the Eleventh Circuit and does not expand upon them and revises its prior interpretation. Order on Mot. to Dismiss SAC at 11 n. 10.

For example, in Calhoun Orthopaedics & Neurosurgery a/a/o Adrian Gonzalez v. Infinity Auto Ins. Co. , Calhoun sued an automobile insurance company-a third party payor-pursuant to an assignment of rights, and stated in relevant part: "[p]ursuant to said Assignment, Plaintiff gave notice of the covered losses and Plaintiff made demand for PIP benefits for reasonable, necessary and related medical treatment." Plaintiff's Request for Judicial Notice of Adjudicative Facts (ECF No. 255-2) at 2. Further, Calhoun stated that defendant "denied coverage for, withheld or reduced the medical bill(s) that were submitted by Plaintiff ." Id. (emphasis added).

State Farm moved to strike the Declaration arguing that the Declaration directly contradicts Defendants' sworn testimony without valid explanation. The Court denied State Farm's Motion to strike the Declaration and found that the Declaration should be considered-not stricken-and that the alleged inconsistencies speak to the declarant's credibility. (ECF No. 267).

In Millenium Laboratories, defendant's argued "that Plaintiff fails to state a claim for [several counts, including a violation of the FDUTPA] because Plaintiff's claims are predicated exclusively on its assumption that Defendants' conduct violate[s] the Healthcare Fraud Statutes, which provide no private right of action." 2012 WL 12905083, at *5. The healthcare fraud statutes at issue, as relevant here, included the Florida Patient Brokering and Anti-Kickback Statutes. Id. at *1. Although the court did not expressly state that these statutes are "predicate offenses" under the FDUTPA, this conclusion necessarily follows because the court permitted the FDUTPA claim predicated upon violation of these statutes to survive dismissal. Id. at *7.

Courts have found similar statutory provisions to proscribe conduct that is unfair. See, e.g. , In re Roberson , 165 B.R. 620, 624 (M.D. Tenn. 1994) (stating that violating Tennessee's anti-rebate law pertaining to insurance policies is an unfair trade practice).

A plaintiff "may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him. Democratic Republic of the Congo v. Air Capital Grp., LLC, No. 12-cv-20607, 2013 WL 3223686, at *6 (S.D. Fla. June 24, 2013). Plaintiff concedes that the "common law fraud claim is limited to those injury claims it settled before discovering the truth of Defendants' arrangement with Metropolitan." Pl.'s Resp. at 2.

Defendants argue elsewhere, without legal support, that "irrespective of how State Farm labels each of its three claims for monetary relief, they all share a common theory of 'actual damages' and State Farm's damages are impermissibly speculative." Defs.' Mot. at 7-9. For the reasons set forth above, damages are not speculative.